## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JESSICA CASTRO,

     Plaintiff,

v.                         CIVIL ACTION NO.

DFW MASTER BUILT LLC
d/b/a MASTER BUILT ROOFING
and DONALD CLAY HUGHES,

     Defendants.

_____/

## COMPLAINT

COMES NOW Plaintiff JESSICA CASTRO (hereinafter "Plaintiff"), by and through her undersigned attorney, and sues Defendants DFW MASTER BUILT LLC d/b/a MASTER BUILT ROOFING (hereinafter "Master Built") and DONALD CLAY HUGHES (hereinafter "Hughes") (hereinafter referred to collectively as "Defendants") alleging as follows:

## INTRODUCTION

1.     Plaintiff brings this action to remedy acts of discrimination and retaliation pursuant to the provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, and for civil battery, sexual assault and intentional infliction of emotional distress.

1

## JURISDICTION AND VENUE

2.      Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f).

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction) as those claims form part of the same case or controversy.

4.      Declaratory, injunctive and equitable relief is sought pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 2000e-5(g).

5.      Costs and attorneys' fees are sought pursuant to 42 U.S.C. § 2000e-5(k), Fla. Stat. § 760.11(5) and Fed. R. Civ. P. 54.

6.      This action lies in the Northern District of Florida, Pensacola Division, pursuant to 28 U.S.C. § 1391(b) because the action arose in this judicial district, and pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

7.      All conditions precedent and administrative remedies have been exhausted and jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f). Plaintiff dual-filed a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR" Case No. 2025-110949) and the United States Equal Employment Opportunity Commission ("EEOC" Case No. 15D-2025-00532) on January 30, 2025 against DFW Master Built

LLC d/b/a Master Built Roofing. On July 30, 2025, the FCHR issued a determination pursuant to Fla. Stat. § 760.11(3). Plaintiff thereafter timely requested her ninety (90) day Notice of Right to Sue letter from the EEOC, which was received on November 3, 2025, and this action is filed within the required 90-day period.

## PARTIES

8.     Plaintiff is a 38-year-old Hispanic female and a citizen of the State of Florida, residing in Pensacola, Escambia County.

9.     Defendant Master Built is a limited liability corporation, licensed to do and doing business in the State of Florida, Escambia County. Master Built maintains its principal place of business at 225 N. Pace Boulevard, Suite 501, Pensacola, Florida 32505.

10.     Defendant Hughes is an individual who, at all times relevant herein, was the owner and operator of Master Built and Plaintiff's direct supervisor. Hughes exercised complete control over all aspects of Plaintiff's employment, including hiring, compensation, work assignments, schedules and termination decisions.

11.     At all times relevant herein, Defendants employed more than fifteen (15) employees and are employers within the meaning of, and as defined in, Title VII, as amended, 42 U.S.C. § 2000e(b), *et seq.*

12.    At all times relevant herein, Defendant Hughes was an agent of Defendant Master Built acting within the scope of his employment and in furtherance of Master Built's business interests.

13.    At all times relevant herein, Defendant Hughes held such a high position in Master Built (the owner) that he could be considered the company's "alter ego" for purposes of corporate liability.

14.    At all times relevant herein, Defendant Hughes, as owner of Master Built, and Master Built are indistinguishable from one another by virtue of his complete ownership and control of the company.

## **GENERAL FACTS**

15.    Plaintiff is a 38-year-old Hispanic female.

16.    Plaintiff met Defendant Hughes, the owner of Master Built, in October 2018 and they began a romantic relationship in January 2019.

17.    Plaintiff began working for Master Built in 2019 as an independent contractor (1099 employee) assisting in business development and management operations.

18.    In August 2021, Plaintiff transitioned to W-2 employee status with Master Built.

19.    Plaintiff's job title was Business Development Coordinator/Operations Manager.

20. At all times material hereto, Defendant Hughes was Plaintiff's direct supervisor and held complete authority over her role, schedule, compensation and all terms and conditions of her employment.

21. During her employment with Master Built, Plaintiff performed her duties and responsibilities in a satisfactory manner and was never subject to any documented disciplinary action or performance deficiency.

22. In 2024, Plaintiff earned federal wages of $43,231.13 from Master Built as reflected on her W-2.

23. In October 2022, Plaintiff relocated from Texas to Pensacola, Florida at Hughes' direction to work at Master Built's Pensacola location.

24. From the time Plaintiff was hired in 2019, it became clear that her employment and job security were directly and inextricably tied to her personal romantic relationship with Hughes.

25. Hughes, as owner and Plaintiff's direct supervisor, held complete authority over every aspect of Plaintiff's employment, creating an inherent and severe power imbalance in their relationship.

26. Hughes maintained this power imbalance throughout the relationship by leveraging his control over Plaintiff's employment to maintain control over the romantic relationship.

27.     Any tension or disagreement in the personal relationship would immediately spill over into the work environment, affecting Plaintiff's job duties, responsibilities and compensation discussions.

28.     Beginning in late 2021 and continuing through 2024, whenever Plaintiff expressed unhappiness in the personal relationship or attempted to create distance, Hughes would make threatening comments about changing company structure, her position, her compensation or her continued employment.

29.     Hughes used these threats to coerce Plaintiff into maintaining the romantic relationship against her will, making it clear that ending the relationship would result in adverse employment consequences.

30.     Plaintiff felt that she could not leave the relationship or create any distance without risking her job, income and career stability.

31.     Hughes used his position as owner and supervisor to maintain absolute control over Plaintiff, both personally and professionally.

32.     Plaintiff's personal and professional lives were completely entangled by Hughes' design and coercion, creating a situation where walking away from the relationship would have meant losing her income and career stability.

33.    This dynamic constituted unlawful quid pro quo sexual harassment as Plaintiff's continued employment was expressly conditioned upon maintaining a romantic and sexual relationship with her supervisor.

34.    When Plaintiff transferred to the Pensacola location in October 2022, the hostile and abusive dynamics worsened significantly.

35.    Plaintiff became increasingly isolated from any meaningful support system, both personal and professional, leaving her completely dependent on Hughes.

36.    Hughes' temper escalated dramatically during this period, becoming increasingly volatile and violent.

37.    Hughes would regularly yell at Plaintiff, break objects and throw things during arguments in the workplace.

38.    These outbursts happened both behind closed doors and in front of employees, creating an atmosphere of fear and intimidation.

39.    These violent displays made Plaintiff feel unsafe and constantly on edge at work.

40.    Plaintiff felt trapped in both the relationship and the job, with no safe way out.

41.    The work environment had become emotionally and psychologically oppressive because of the overwhelming control and

unpredictability Plaintiff faced from Hughes, who had total control over her employment and her life.

42.    Hughes' pattern of volatile behavior, threats regarding Plaintiff's employment and use of his supervisory authority to maintain control over the romantic relationship created a work environment that was objectively hostile, intimidating and abusive.

43.    This conduct occurred regularly throughout Plaintiff's employment and escalated in intensity from 2021 through September 2024.

44.    On September 2, 2024 (Labor Day), Hughes was highly intoxicated while on his boat at Southwind Marina in Pensacola.

45.    On that date, Hughes physically assaulted Plaintiff by pushing her and grabbing and violently yanking her hair, thereby causing injury to her head and neck.

46.    During the same incident, Hughes also physically assaulted Plaintiff's minor son by striking his chest and violently pushing/shoving him.

47.    Law enforcement responded to 911 calls reporting a group of drunk people fighting, yelling and a female screaming for help.

48.    Hughes was arrested by the Escambia County Sheriff's Office on September 2, 2024 at approximately 9:16 PM.

49.    Hughes was charged with:

a.  Battery (Domestic Violence) - Misdemeanor - against Plaintiff (Fla. Stat. § 784.03); and,

b.  Cruelty to Child (Domestic Violence) - Felony - against Ayden Castro (Fla. Stat. § 827.03).

50.  The arrest report documented visible injuries to Plaintiff and confirmed the domestic violence nature of the assault.

51.  As a result of the September 2, 2024 assault, Plaintiff immediately ended all personal contact with Hughes.

52.  Plaintiff sought medical treatment on September 4, 2024 for the injuries she sustained in the assault by Hughes.

53.  On September 3, 2024, Plaintiff filed for an injunction for protection against domestic violence against Hughes for her safety and the safety of her son.

54.  Hughes was released from jail on September 4, 2024.

55.  On September 5, 2024, one day after Hughes' release from jail, Plaintiff attempted to log into Master Built's work systems to begin her workday and discovered she had been completely locked out of all company systems, including QuickBooks, CRM Job Nimbus, Email, GoDaddy, RingCentral and OneDrive.

56.    Plaintiff received absolutely no communication from Master Built or Hughes regarding her employment status.

57.    Plaintiff was never formally informed that she had been terminated.

58.    Plaintiff was never provided any reason for being locked out of work systems or for the termination of her employment.

59.    Based on being locked out of all systems, stripped of all access to company platforms and completely ignored by all company contacts, it was clear that Plaintiff had been terminated effective September 5, 2024.

60.    The timing of the termination - occurring immediately after Hughes was released from jail following his arrest for assaulting Plaintiff - demonstrates that the termination was in direct retaliation for Plaintiff ending the romantic relationship and participating in the criminal process as a victim.

61.    Plaintiff had no documented performance issues or pending disciplinary actions against her at the time of her termination.

62.    The termination occurred directly after Plaintiff became the victim in a criminal case involving the company's owner and after she ended the long-term personal/romantic relationship that had been coercive and abusive.

63.    Plaintiff was effectively punished for removing herself from the abusive relationship and for Hughes facing legal consequences for his criminal conduct.

64.    Hughes used his control of the company to immediately sever all of Plaintiff's professional access and cut off all communication without explanation, warning or opportunity to respond.

65.    Master Built had no Human Resources department or internal complaint system in place.

66.    Hughes, as the owner, was both Plaintiff's employer and the person responsible for the harassment, leaving no safe or neutral person to whom Plaintiff could report the harassment.

67.    Plaintiff reasonably feared that any attempt to formally complain about the harassment would lead to immediate retaliation or termination, which is exactly what occurred when she ended the relationship and participated in the criminal process.

68.    The lack of any internal complaint mechanism, combined with Hughes' complete control over the company and Plaintiff's employment, made it impossible for Plaintiff to report the harassment without risking her livelihood.

69. Because Hughes was the owner and de facto HR representative, Plaintiff had no one to report his conduct to and further she was fearful of being retaliated against by Hughes.

70. On October 1, 2024, Brady Hale, a 1099 employee of Master Built, contacted Plaintiff asking for system passcodes and company access information on behalf of Hughes.

71. This contact occurred more than one month after Plaintiff had been locked out and terminated, yet the company made no formal communication with Plaintiff directly, demonstrating the retaliatory and unprofessional nature of the termination.

72. On October 2, 2024, Hughes was arrested and charged with contempt of court for violating the no-contact order by having a third-party contact Plaintiff.

73. On March 28, 2025, Hughes was found guilty and an adjudication of guilt was entered on two (2) counts of Domestic Violence Battery - Touch or Strike relating to the September 2, 2024 incident (Escambia County Case No. 2024MM004668A).

74. Hughes was sentenced to ten (10) days in jail and one (1) year of probation.

75.     On April 16, 2025, the Santa Rosa County Circuit Court issued a Final Judgment of Injunction for Protection Against Domestic Violence for both Plaintiff and her son Ayden Castro against Hughes (Case Nos. 24001810DRMXAX and 24001468DRMXAX).

76.     The issuance of the permanent injunction confirms that the court found sufficient grounds to believe there was ongoing danger and harassment toward Plaintiff, which further supports the existence of a hostile and retaliatory environment surrounding her employment.

77.     Plaintiff applied for unemployment benefits following her termination.

78.     The fact that unemployment benefits were granted supports that there was no legitimate, performance-based reason for Plaintiff's termination.

## **COUNT I**
### *(TITLE VII - QUID PRO QUO SEXUAL HARASSMENT)*

79.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 7 through 78 of this Complaint with the same force and effect as if set forth herein.

80.     Defendants discriminated against Plaintiff in the terms and conditions of her employment by subjecting her to quid pro quo sexual harassment in violation of Title VII.

81.     Plaintiff is a female.

82.     Throughout Plaintiff's employment, Defendant Hughes, as owner and Plaintiff's direct supervisor, expressly conditioned Plaintiff's continued employment, job security, compensation and career advancement on maintaining a romantic and sexual relationship with him.

83.     Hughes used his authority as owner and supervisor to coerce Plaintiff into maintaining the romantic relationship by making explicit and implicit threats about changing her position, compensation or employment status whenever she expressed unhappiness or attempted to create distance in the relationship.

84.     Plaintiff's employment and job security were directly and inextricably tied to maintaining the personal romantic relationship with Hughes.

85.     Plaintiff felt she could not end the relationship without risking her job and financial stability.

86.     When Plaintiff finally ended the relationship on September 2, 2024, following Hughes' arrest for physically assaulting her and her son, she was immediately and unlawfully terminated in retaliation.

87.     The unwelcome sexual relationship was maintained through coercion based on Hughes' supervisory authority and control over Plaintiff's employment.

88.    Hughes' conduct altered the terms and conditions of Plaintiff's employment by making continued employment contingent upon maintaining a romantic and sexual relationship.

89.    This conduct constitutes quid pro quo sexual harassment in violation of Title VII.

90.    Plaintiff suffered tangible employment action - termination - as a direct result of ending the coerced romantic relationship.

91.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until this Court grants relief.

## COUNT II
*(TITLE VII - HOSTILE WORK ENVIRONMENT/SEXUAL HARASSMENT)*

92.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 7 through 78 of this Complaint with the same force and effect as if set forth herein.

93.    Defendants discriminated against Plaintiff in the terms and conditions of her employment by subjecting her to sexual harassment and a hostile work environment in violation of Title VII.

94.    Plaintiff is a female.

95.    Defendant Hughes subjected Plaintiff to severe and pervasive unwelcome conduct of a sexual nature that created a hostile work environment.

96.    Hughes' conduct included:

    a.  Conditioning Plaintiff's employment on maintaining a romantic and sexual relationship;

    b.  Making threatening comments about Plaintiff's employment whenever she expressed unhappiness in the relationship;

    c.  Creating an atmosphere of fear and control by leveraging his supervisory authority to maintain the coerced romantic relationship;

    d.  Engaging in violent and volatile behavior, including yelling, breaking objects and throwing things during arguments at work;

    e.  Physically assaulting Plaintiff on September 2, 2024;

    f.  Creating an environment where Plaintiff felt unsafe, isolated and trapped; and

    g.  This conduct was unwelcome and offensive to Plaintiff.

97.    The conduct was based on Plaintiff's sex, as Hughes would not have engaged in this conduct with a male employee.

98.    The conduct was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive working environment.

99.  Plaintiff's workplace was permeated with discriminatory intimidation, ridicule and insult as the result of Defendants' continued failure to address and stop the continual and unwelcome sexual harassment and hostile work environment to which Plaintiff was subjected.

100.  The hostile work environment existed from late 2021 through September 2024 and escalated significantly after Plaintiff's transfer to Pensacola in October 2022.

101.  A reasonable person in Plaintiff's position would have found the work environment to be hostile and abusive.

102.  Plaintiff subjectively perceived the environment as hostile and abusive, which is evidenced by her emotional distress, fear and ultimate need to end the relationship despite knowing it would cost her employment.

103.  Defendant Master Built is strictly liable for Hughes' harassment because Hughes was Plaintiff's supervisor with authority to hire, fire and control all terms and conditions of her employment, and because Plaintiff suffered a tangible employment action (termination) as a result of the harassment.

104.  Alternatively, Defendant Master Built is liable because it failed to exercise reasonable care to prevent and correct the sexually harassing

behavior, failed to provide any avenue for Plaintiff to complain and had no effective grievance mechanism in place.

105.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until this Court grants relief.

## COUNT III
### *(TITLE VII - GENDER DISCRIMINATION)*

106.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 7 through 78 of this Complaint with the same force and effect as if set forth herein.

107.   Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

108.   Plaintiff is a female.

109.   Defendant Hughes subjected Plaintiff to different and less favorable terms and conditions of employment because of her sex.

110.   Hughes conditioned Plaintiff's employment on maintaining a romantic and sexual relationship - conduct that he would not have and could not have imposed on a male employee.

111.   Hughes leveraged his supervisory authority and Plaintiff's sex to coerce and maintain control over her through the intertwining of her employment with the romantic relationship.

112. Hughes created an environment where Plaintiff's employment, compensation and career advancement were dependent on factors unrelated to her job performance and instead tied to maintaining a sexual relationship.

113. Similarly situated male employees were not subjected to this type of treatment or requirement.

114. When Plaintiff ended the romantic relationship following the September 2, 2024 assault, she was immediately terminated while male employees with similar or lesser qualifications and performance were retained.

115. Defendants' treatment of Plaintiff was motivated by her sex and gender.

116. Defendants' conduct altered the terms and conditions of Plaintiff's employment and subjected her to discrimination because of her sex in violation of Title VII.

117. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until this Court grants relief.

## **<u>COUNT IV</u>**
### *(TITLE VII – RETALIATION)*

118. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 7 through 78 of this Complaint with the same force and effect as if set forth herein.

119.   Defendants retaliated against Plaintiff for availing herself of the protections afforded her pursuant to Title VII.

120.   Plaintiff is a female.

121.   Plaintiff engaged in protected activity under Title VII by:

    a.   Objecting to and opposing the sexually coercive relationship that conditioned her employment on maintaining a romantic relationship with her supervisor;

    b.   Ending the coerced romantic relationship;

    c.   Becoming a victim in a criminal case against Hughes stemming from his assault;

    d.   Filing an injunction for protection against Hughes;

    e.   Filing a Charge of Discrimination with the FCHR and EEOC on January 30, 2025;

    f.   Participating in the EEOC administrative investigation by providing detailed responses to investigative questions and supporting documentation; and

    g.   Opposing the unlawful discrimination and harassment to which she was subjected.

122.   Defendants had knowledge of Plaintiff's protected activity.

123.   Following Plaintiff's protected activity, Defendants took adverse employment action against Plaintiff by terminating her employment effective September 5, 2024.

124.   The adverse employment action occurred immediately after Plaintiff engaged in protected activity - specifically, one day after Hughes was released from jail following his arrest for assaulting Plaintiff.

125.   Following the filing of Plaintiff's EEOC charge, Defendants have continued to refuse to communicate with Plaintiff, have maintained the retaliatory termination and have taken no remedial action.

126.   On October 2, 2024, Hughes was arrested for contempt of court for violating the no-contact order, demonstrating his continued pattern of harassment and retaliation against Plaintiff even after the termination.

127.   There is a causal connection between Plaintiff's protected activity and the adverse employment action, as evidenced by the temporal proximity and the complete absence of any legitimate, non-retaliatory business reason for the termination.

128.   Plaintiff had no documented performance deficiencies, had never been disciplined and was performing her job duties satisfactorily at the time of termination.

129.   Defendants never provided any reason for the termination, never gave Plaintiff notice, never conducted any pre-termination process and simply locked her out of all systems without explanation.

130.   The only change in circumstances was that Plaintiff ended the coerced romantic relationship after Hughes assaulted her, causing Hughes to be arrested and criminally charged.

131.   Defendants' stated reason for termination - that Plaintiff voluntarily resigned or was looking for other employment - is demonstrably pretextual as:

   a.   Plaintiff never resigned;

   b.   Plaintiff attempted to access work systems to continue working;

   c.   Plaintiff inquired about her employment status;

   d.   Searching for supplemental employment (which Hughes knew about and approved) is not grounds for termination; and

   e.   The unemployment office found Defendants' reasons insufficient and granted benefits.

132.   The temporal proximity between Plaintiff's protected activity (ending the relationship and Hughes' arrest on September 2, 2024) and the

adverse action (termination on September 5, 2024) - merely three (3) days - gives rise to an inference of retaliation.

133.   Any assertion that there was a viable business justification for Plaintiff's termination is entirely pretextual and cannot overcome the clear evidence of retaliation.

134.   Defendants' retaliation violated Title VII, including both the opposition clause and participation clause of 42 U.S.C. § 2000e-3(a).

135.   As a result of Defendants' violations of Title VII, Plaintiff has been substantially damaged in that she has lost wages, associated job benefits and has sustained compensatory damages based upon the emotional distress associated with the unlawful and retaliatory actions of Defendants.

136.   As a result of the unlawful and retaliatory actions that led to her termination, Plaintiff has been experiencing anxiety, depression and difficult economic circumstances, and she has sustained continued mental and psychological distress due to Defendants' actions.

137.   Defendants' continued refusal to remedy the unlawful termination and their ongoing harassment constitutes retaliation that has caused and continues to cause Plaintiff ongoing harm, emotional distress and economic damages.

138.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' retaliatory practices unless and until this Court grants relief.

## COUNT V
### *(CIVIL BATTERY)*
## APPLIED TO DEFENDANTS MASTER BUILT AND HUGHES

139.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 44 through 76 of this Complaint with the same force and effect as if set forth herein.

140.    This is an action for damages against Defendants for civil battery.

141.    On September 2, 2024, Defendant Hughes intentionally inflicted harmful and offensive contact upon Plaintiff by pushing her and grabbing her hair, thereby causing injury.

142.    The actions of Hughes were harmful and offensive.

143.    Hughes' actions occurred during work hours, on work premises (Hughes' boat used for business entertainment and client relations) and while Hughes was acting in his capacity as owner and supervisor of Master Built.

144.    Hughes was assisted in accomplishing the tort by virtue of the employer-employee relationship, as Plaintiff was present on the boat in connection with work-related activities and the relationship that Hughes had coerced as a condition of her employment.

145.   Defendant Master Built is directly liable for Hughes' intentional tort because Hughes holds such a high position in the company as owner that he is considered the company's "alter ego."

146.   Defendant Master Built is vicariously liable for Hughes' intentional tort because Hughes' actions were facilitated by and during the course of the employment relationship that Hughes himself controlled.

147.   As a direct and proximate result of the acts of Defendants described above, Plaintiff has been damaged, including, without limitation, by sustaining physical, psychological and psychiatric harm and injury, mental anguish, pain and suffering, past and future lost income, future loss of earning capacity, loss of capacity for enjoyment of life and medical expenses.

**COUNT VI**
*(SEXUAL ASSAULT)*
APPLIED TO DEFENDANTS MASTER BUILT AND HUGHES

148.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 44 through 76 of this Complaint with the same force and effect as if set forth herein.

149.   This is an action for damages against Defendants for sexual assault.

150.   Throughout Plaintiff's employment, Defendant Hughes made unwelcome sexual advances toward Plaintiff, physically touched Plaintiff in a

sexual manner without her consent and leveraged his position of authority to maintain a coercive sexual relationship.

151.  Hughes' actions constituted an intentional, unlawful offer of corporal injury to Plaintiff by force — or, in the alternative, force unlawfully directed toward Plaintiff under such circumstances as to create a fear of imminent peril — coupled with the apparent present ability to effectuate the attempt.

152.  Plaintiff experienced actual fear of imminent peril as Hughes used his position of power and control to coerce her into maintaining an unwelcome sexual relationship and made threatening statements about her employment.

153.  Hughes' actions occurred during the course and scope of his employment as owner and supervisor, as he used his supervisory authority and control over Plaintiff's employment to accomplish the assaults.

154.  Defendant Master Built is directly liable for Hughes' intentional tort because Hughes holds such a high position in the company as owner that he is considered the company's "alter ego."

155.  Defendant Master Built is vicariously liable for Hughes' sexual assault because Hughes was assisted in accomplishing the tort by virtue of the employer-employee relationship and his supervisory authority over Plaintiff.

156.   As a direct and proximate result of the acts of Defendants described above, Plaintiff has been damaged, including, without limitation, by sustaining physical, psychological and psychiatric harm and injury, mental anguish, pain and suffering, past and future lost income, future loss of earning capacity, loss of capacity for enjoyment of life and medical expenses.

**COUNT VII**
*(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)*
APPLIED TO DEFENDANTS MASTER BUILT AND HUGHES

157.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 44 through 76 of this Complaint with the same force and effect as if set forth herein.

158.   This is an action for damages against Defendants for intentional infliction of emotional distress.

159.   Defendants' acts described herein were intentional and reckless.

160.   Defendants knew or should have known that the acts described herein would result in emotional distress to Plaintiff.

161.   Defendants' conduct was so outrageous as to go beyond all possible bounds of decency and is regarded as odious and utterly intolerable in a civilized community, including:

a.   Conditioning Plaintiff's employment on maintaining a romantic and sexual relationship with her supervisor who held complete control over her livelihood;

b.   Making persistent and explicit threats about Plaintiff's job, compensation and career whenever she expressed unhappiness in the coerced relationship;

c.   Engaging in violent and volatile behavior, including yelling, breaking objects and throwing things at work;

d.   Physically assaulting Plaintiff by pushing her and grabbing her hair causing injury;

e.   Physically assaulting Plaintiff's minor son;

f.   Immediately terminating Plaintiff's employment without notice or explanation after she ended the abusive relationship following Hughes' arrest for domestic violence;

g.   Using complete control over the company to lock Plaintiff out of all work systems and cutting off all communication; and

h.   Creating an environment where Plaintiff felt trapped, isolated, unsafe and unable to escape without losing her livelihood.

162.   The presence of relentless physical contact (grabbing, pushing, physical assault) coupled with persistent verbal abuse (threats regarding employment, volatile outbursts, yelling) and threats of retaliation constitutes conduct of sufficient outrageousness to support a claim for intentional infliction of emotional distress.

163.   Hughes' conduct involved offensive, non-negligible physical contact combined with persistent verbal abuse and actual retaliation.

164.   Hughes' actions occurred during the course and scope of his employment as owner and supervisor as he used his supervisory authority and control over Plaintiff's employment to accomplish the intentional infliction of emotional distress.

165.   Defendant Master Built is directly liable for Hughes' intentional tort because Hughes holds such a high position in the company as owner that he is considered the company's "alter ego."

166.   Defendant Master Built is vicariously liable for Hughes' intentional infliction of emotional distress because Hughes was assisted in accomplishing the tort by virtue of the employer-employee relationship and his supervisory authority over Plaintiff.

167.   Because Hughes was the owner and de facto HR representative, Plaintiff had no one to report his conduct to and further she was fearful of being retaliated against by Hughes, which in fact occurred.

168.   Defendants' conduct described herein in fact caused Plaintiff severe emotional distress that necessitated mental health treatment and continues to affect her psychological well-being.

169.   As a direct and proximate result of the acts of Defendants described herein, Plaintiff has been damaged, including, without limitation, by sustaining physical, psychological and psychiatric harm and injury, mental anguish, pain and suffering, past and future lost income, future loss of earning capacity, loss of capacity for enjoyment of life and medical expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to enter a judgment:

a) Declaring the acts and practices complained of herein are in violation of Title VII;

b) Enjoining and permanently restraining those violations of Title VII;

c) Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are

eliminated and do not continue to affect Plaintiff's employment opportunities;

d) Directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her and make her whole for all earnings she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, wages past and future, pension and other lost benefits;

e) Awarding Plaintiff Front Pay in lieu of reinstatement;

f) Awarding Plaintiff compensatory damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, stress, depression and other non-pecuniary losses caused by Defendants' unlawful discrimination and retaliation, subject to the statutory limitations set forth in 42 U.S.C. § 1981a(b)(3);

g) Awarding Plaintiff compensatory damages for the physical, psychological and psychiatric harm and injury, mental anguish, pain and suffering, loss of capacity for enjoyment of life and medical expenses caused by Defendants' intentional torts;

h) Awarding Plaintiff punitive damages for Defendants' malicious and reckless conduct in violating Title VII, and for Defendants' intentional torts committed with malice, wanton disregard or reckless indifference to Plaintiff's rights;

i) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k), Fla. Stat. § 760.11(5), and Fed. R. Civ. P. 54; and,

j) Granting such other and further equitable relief as the Court deems just and proper in the premises.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action on all issues so triable.

Dated: February 26, 2026.

Respectfully submitted,

By: */s/ Clayton M. Connors*
Clayton M. Connors, Esq.
Florida Bar No.: 0095553
Email: cmc@westconlaw.com
**THE LAW OFFICES OF**
**CLAYTON M. CONNORS, PLLC**
4300 Bayou Blvd., Suite 37
Pensacola, Florida 32503
Tel: (850) 473-0401
S/E: mindy@westconlaw.com
*Attorney for Plaintiff*